*** NOT FOR PUBLICATION ***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| HUNT CONSTRUCTION GROUP, INC., | : | Civil Action No. 08-3550 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| THE HUN SCHOOL OF PRINCETON, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**WOLFSON, United States District Judge:**

This dispute arises out of a construction project ("the Project") completed by Plaintiff Hunt Construction Group, Inc. ("Hunt") on the campus of Defendant The Hun School of Princeton ("Hun School" or "the School"). While the action initially involved only the Plaintiff and Defendant, through the assertion of third-party complaints, the number of parties has grown to include several more. Five of these parties have filed a total of six motions and cross-motions for summary judgment, upon which the Court now simultaneously rules. The result of each of these motions is largely affected by this Court's ruling on the central issue: whether the School waived its right to sue Hunt for the acts of Hunt's subcontractor, Interstate Industrial Corp. ("Interstate"), which allegedly contributed to flood-related damage to the School's gymnasium floor in July 2006 and July 2007.

For the following reasons, the Court concludes that the School waived its right to sue Hunt and dismisses its counterclaims.  In light of this ruling, and for further reasons explained herein, the Court grants the following motions:  Hunt's motion for summary judgment against the School, Third-Party Defendant G.R. Murray Insurance Inc.'s ("G.R. Murray's") motion for summary judgment against the School on the School's negligence claim, and Hunt's motion for summary judgment on its indemnification claim against Interstate.  And, the Court denies as moot the following motions:   the School's cross-motion for partial summary judgment, Interstate's motion for partial summary judgment on its breach of contract counterclaim, and Hunt's "Pass Through" motion for summary judgment against Interstate.  The result of these rulings is that all of the parties' various claims have been adjudicated and this case is, therefore, closed.

## I.    BACKGROUND

In or around December 2004, Hunt and the Hun School entered into a 1997 AIA Document A111 construction contract ("Agreement") for the construction of a new athletic building, connected to the School's existing athletic building, and for some renovations to the existing building ("the Project").   Compl. at ¶ 5.  The dispute, as is the case in most construction litigation, generally involves contentions by the contractor (here, Hunt) that it was not fully paid, and contentions by the owner (here, the School) that the work was defective and led to property damage (here, flood-related damage).  Further, as is the case in most construction disputes, the contractor contends that its subcontractors (Interstate and PJM Mechanical

Contractors ("PJM")) are responsible for any defects in workmanship.  One of the subcontractors (here, PJM), in turn, contends that the engineering firm (TMG Engineering, Inc. ("TMG Engineering")) provided negligent drawings for the installation of the Project's HVAC system.  Lastly, the School brings a third-party claim against its insurer (G.R. Murray Insurance, Inc. ("G.R. Murray")) for negligent failure to procure proper insurance that would have covered the flood damage.

> A.    <u>Facts</u>

The dispute distills to several undisputed facts.  Two floods occurred in July 2006 and July 2007 while Hunt and one of its subcontractors, Interstate, were renovating the School's gymnasium and the surrounding area.  According to the School, Interstate's defective work caused the gymnasium floor to incur substantial damage during those two floods.  The first flood, in July 2006, damaged the floor so greatly that it had to be replaced.  The School bore the cost of that replacement, which was in excess of $317,013.  The second flood, in July 2007, caused around $30,000 in damage to the new floor.  Again, the School bore the cost of that damage.

Under the Agreement, the School was obligated to either purchase builder's risk insurance or to notify Hunt that it would not purchase such insurance so that Hunt could procure it instead.  Specifically, paragraph 11.4.1 of the Agreement's General Conditions requires the Owner (the School) to

> purchase and maintain . . . property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modification and cost of materials

3

> supplied or installed by others, comprising total value for the entire Project at the site ... Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing . . . until final payment has been made as provided . . . or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later ....

General Conditions, ¶ 11.4.1. [1]  In the event the Owner elects not to procure the builder's risk insurance, the Agreement directs the Owner to "so inform the Contractor in writing prior to commencement of the Work.  The Contractor may then effect insurance ...." Id. at ¶ 11.4.1.2.  The Agreement, further, provides that "[i]f the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto." Id.

The School purchased a builder's risk policy, which was in effect at the time of the July 2006 flood.  The policy, however, contained an exclusion for existing structures.  Based on that exclusion, the insurer denied coverage.  The School, then, submitted a claim under its general property insurance policy and that claim was accepted by the insurer.

Subsequent to the July 2007 flood, in November of 2007, the School retroactively cancelled the builder's risk policy with a July 1, 2007 effective date. Pl. Stat. Mat. Facts in Supp. Pl. Mot. for Summ. Jdmt., ¶ 19; Def. Resp. to Pl. Stat.

---

[1]    The "Contract Documents" include the General Conditions, Drawings, Specifications, other documents listed in the AIA A11 form, *inter alia.* Id. at ¶ 1.1.

4

Mat. Facts in Supp. Pl. Mot. for Summ. Jdmt., ¶ 19.   Per the retroactive
cancellation, there was no builder's risk policy in effect as of the date of the July
2007 flood.  The School did not notify Hunt that it retroactively cancelled the policy,
allegedly in contravention of the Agreement.  It is not clear from the record whether
the School's general property insurance covered the July 2007 flood.

Importantly, the Agreement includes several waiver provisions that relate to
property and builder's risk insurance procured by the Owner.   Paragraph 11.4.5
provides:

> If during the Project construction period the Owner
> insures properties, real or personal or both, at or adjacent
> to the site by property insurance under policies separate
> from those insuring the Project, or if after final payment
> property insurance is to be provided on the completed
> Project through a policy or policies other than those
> insuring the Project during the construction period, the
> Owner shall waive all rights in accordance with the terms
> of Section 11.4.7 for damages caused by fire or other
> causes of loss covered by this separate property insurance.
> All separate policies shall provide this waiver of
> subrogation by endorsement or otherwise.

General Conditions, ¶ 11.4.5.

Another waiver of subrogation provision is found in ¶ 11.4.7.  The parties
deleted some of the standard AIA language in this provision, and added their own
custom language.  The provision, as altered, reads:

> Waivers of Subrogation.   The Owner and Contractor
> waive all rights against (1) each other and any of their
> subcontractors, sub-subcontractors, agents and
> employees, each of the other, and (2) the Architect,
> Architect's consultants, separate contractors described in
> Article 6, if any, and any of their subcontractors, sub-
> subcontractors, agents and employees, for damages

caused by ~~fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work,~~ **matters insured by Owner's "Builder's Risk" insurance policy** except such rights as they have to proceeds of such insurance held by the Owner as fiduciary.  The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agent and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers of each in favor of other parties enumerated herein.  The <u>Builder's Risk policy</u> ~~policies~~ shall provide such waivers of subrogation by endorsement or otherwise.  A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

<u>Id.</u>, ¶ 11.4.7 (emphasis in original).

Once the Project was completed, the School withheld $317,013 from the monies due Hunt, which amount essentially represents the costs incurred by the School in twice repairing the gymnasium floor.  Hunt then brought this action to compel the School to pay over the withheld funds.  The School responded by asserting its counterclaims related to the defective work it alleges contributed to the flood-related damage to the floor.  The other parties, including Interstate, followed by filing their own claims.

B.    <u>Procedural History</u>

In light of the myriad summary judgment motions before this Court, each involving different claims and asserted by different parties, I embark upon a

detailed procedural history here to provide context for the ensuing discussion.  I, further, provide this detailed background because several causes of action and parties have been dismissed from the suit since the pleading stages.  In the Discussion section, I will recount the facts directly relevant to each summary judgment motion by the various remaining parties.

Hunt filed its complaint on July 11, 2008, asserting breach of contract and unjust enrichment claims.  In connection with the breach of contract claim (First Cause of Action), Hunt alleges that $317,013 is due and owing under the Agreement.  Compl. at ¶ 6.  Hence, Hunt seeks this amount plus interest, costs, and attorneys' fees.  In connection with the unjust enrichment count (Second Cause of Action), Hunt alleged that the School was unjustly enriched in the amount of $317,013; id. at ¶ 13, however, Hunt has since agreed to dismiss this count as explained in more detail *infra*.

The Hun School answered Hunt's Complaint on August 5, 2008, and asserted several counterclaims against Hunt.  The School's first counterclaim seeks a declaratory judgment interpreting the contract to require Hunt to have purchased general liability insurance covering the flood damage.  Answ., ¶ 62.  The second counterclaim asserts a breach of contract claim based on Hunt's "and/or its subcontractor's failure properly [sic] to grade, manage the process of grading, and/or provide temporary storm water management or drainage/flood control measures in the area adjacent to the [School's] gymnasium wall in a timely fashion ….," id. at ¶ 67, Hunt's or its subcontractors' failure to repair holes in the gymnasium's wall in a

timely fashion, id. at ¶ 68, Hunt's failure to obtain an insurance policy covering claims for damages arising out of an "injury to or destruction of tangible property ….," id. at ¶ 69, and for Hunt's "failure properly to install and maintain the HVAC unit ….," id. a ¶ 72.  The School's third counterclaim asserts a claim for breach of the duty of good faith and fair dealing based on the same allegations.  Its fourth counterclaim asserts contractual indemnification, the fifth counterclaim asserts setoff, and the sixth asserts promissory estoppel.  Finally, the seventh counterclaim asserts a violation of the New Jersey Consumer Fraud Act.

In addition to the foregoing counterclaims, the Hun School filed a Third-Party Complaint against Third-Party Defendants G.R. Murray and Michael Sabbagh, one of G.R. Murray's employees.  The Third-Party Complaint asserts a negligence claim arising from the third-party defendants' alleged failure to procure the "correct and necessary insurance policies" called for by the contract between Hunt and the School.  Third-Party Compl., ¶ 10.  On September 9, 2008, Third-Party Defendants G.R. Murray and Michael Sabbagh answered the Third-Party Complaint.

On the heels of G.R. Murray's and Michael Sabbagh's Answer to the Hun School's Third-Party Complaint, Hunt filed its own third-party complaint (titled "Fourth-Party Complaint") in conjunction with its answer to the School's counterclaim dated September 10, 2008.  Hunt's Fourth-Party Complaint impled Interstate and PJM, two of Hunt's subcontractors on the Project, as fourth-party defendants.  Hunt Fourth-Party Compl., ¶ 109.  By way of its Fourth-Party

Complaint, Hunt seeks indemnification and contribution from Interstate and PJM. According to Hunt, the request for indemnification is rooted in both a contractual obligation under the parties' subcontracts and the common law. Interstate filed its answer to Hunt's Fourth-Party Complaint on October 7, 2008. Along with its answer, Interstate asserted counterclaims against Hunt sounding in breach of contract, specifically, alleging that Hunt owes it $163,839.05 for work performed under the parties' subcontract. Interstate Answ. and Countercl., ¶ 3.

Shortly thereafter, on November 3, 2008, PJM filed a "Fifth Third Party Complaint," asserting claims against TMG Engineering, Inc. ("TMG Engineering"), a professional engineering firm that provided drawings and specifications for the School's HVAC system. See Fifth Third Party Compl., ¶ 7. PJM's causes of action against TMG Engineering sound in negligence and contribution/indemnification, each related to the HVAC system at the School. Several months later, on February 27, 2009, Hunt filed its answer to Interstate's counterclaims.

Meanwhile, several claims and parties were dismissed from the suit. Hunt filed a motion to dismiss the Hun School's seventh counterclaim asserting a violation of the New Jersey Consumer Fraud Act, and that motion was granted on May 11, 2009. On June 22, 2009, Hunt, the School, and PJM entered into a Stipulation of Dismissal, thereby settling and dismissing "all causes of action, claims, defenses, and facts in all pleadings . . . that refer or relate to the Project's HVAC System ...." By virtue of this Stipulation, PJM was dismissed from the suit. Its "Fifth-Party Complaint" against TMG was also dismissed via the Stipulation

because its claims against TMG were all related to the Project's HVAC System.  On January 11, 2010, the School and G.R. Murray Insurance dismissed with prejudice Third-Party Defendant Michael Sabbagh, and all claims against him, from the suit. Finally, through Hunt's Motion for Summary Judgment against the School, and the School's Cross-Motion for Partial Summary Judgment against Hunt, Hunt agreed to dismiss its unjust enrichment claim and the School agreed to dismiss its promissory estoppel counterclaim.

The following parties and claims survived the foregoing dismissals:  (a) Hunt's breach of contract claim against the Hun School; (b) the School's first through fifth counterclaims against Hunt, asserting declaratory judgment, breach of contract, breach of the duty of good faith and fair dealing, contractual indemnification, and setoff, to the extent those claims do not refer or relate to the Project's HVAC System; (c) the School's third-party complaint against G.R. Murray for negligent procurement of insurance; (d) Hunt's "fourth-party complaint" against Interstate for indemnification and contribution; and (e) Interstate's counterclaim against Hunt for breach of contract.

## II.   DISCUSSION

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine,

there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276 77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Monroe v. Beard, 536 F.3d 198, 206-07 (3d Cir. 2008). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256 57. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." Id. at 206 (quoting Matsushita, 475 U.S. at 586). Moreover, the non moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed,

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  A nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible.  S.E.C. v. Antar, 44 Fed.Appx. 548, 554 (3d Cir. 2002).

**A.     Hunt's Motion for Summary Judgment against the School on its Breach of Contract Claim and on all of the School's Counterclaims**

Hunt argues that the School's remaining counterclaims must be dismissed because they are waived under paragraphs 11.4.5 and 11.4.7 of the Agreement. Additionally, Hunt seeks summary judgment on its breach of contract claim against the School for withholding payment, in the amount of $317,013, for work completed under the Agreement.  In connection with each of these arguments, the parties disagree as to what constitutes the "Project" and "Work" under the Agreement. Because the pertinent Agreement language turns, in part, on those definitions I interpret them first here.

1.     Defining "Work" and the "Project"

12

"Work" is defined under the Agreement as the "construction of the Project and includes all labor, materials, equipment, and services reasonably inferable from the Contract Documents as necessary to construct the Work in accordance with the Contract Documents . . . except for any Work which Owner awards by separate contract pursuant to Article 6 of the General Conditions." Agreement, ¶ Art. 2. Article 6 of the General Conditions refers to "separate contracts in connection with other portions of the Project …." General Conditions, ¶ 6.1.1. The General Conditions, further, clarify that "[t]he Work may constitute the whole or a part of the Project." Id. at ¶ 1.1.3. The "Project," then, is defined as "the total construction described in the Agreement of which the Work performed under the Contract Documents may be the whole or part and which may include construction by the Owner or by separate contractors." ¶ Id. at ¶ 1.1.4.

Here, the Project includes the renovation of the existing School gymnasium and the construction of a new addition to that gymnasium, including the renovation of the existing gymnasium's floor. Attachments to the Agreement explicitly describe "Athletic Building Renovations and Additions," including "removing existing sports floors," and "sports flooring repair and refinishing" and "new sports flooring— furnishing or installing …." Fedun Decl. in Supp. of Mot. for Summ. Jdmt., Exh. 11 (Addendum 5.2.5). Further, the existing basketball court in the gymnasium, along with a new basketball court, is designated by the Contract Documents as an "Owner Furnished Item." Moran Decl. in Supp. of Mot. for Summ. Jdmt., Exh. 11. See also

Mitchell Cert. in Opp. to Summ. Jdmt., Exh. G, Project Manual (describing "wood athletic flooring" as part of the "Project").

The Contract Documents also list a separate contractor, "Flynn" as Vendor for the floors. Both parties agree that Hunt was not responsible for removing or refurnishing the existing gymnasium floor. Rather, that responsibility fell upon the School, and it appears that the School hired Flynn as a separate contractor to complete that work in accordance with Article 6 of the General Conditions. See Pl. Stat. Mat. Facts, ¶ 2; Def. Stat. Mat. Facts ¶ 2. Thus, the work related to the gymnasium floors was part of the Project, but not part of Hunt's Work.

### 2. The School's Counterclaims

Hunt brings several challenges to the School's counterclaims, arguing that it is entitled to summary judgment on each count. Its primary argument is that the waivers found in paragraphs 11.4.5 and 11.4.7 of the Agreement preclude the School from asserting any claims against Hunt.[2] For the following reasons, I agree with Hunt that the School has waived all its counterclaims under the terms of the Agreement.

---

[2]     Alternatively, Hunt argues that those counterclaims arising under the Agreement, *i.e.*, Counts One, Two, and Four, must be dismissed due to the School's failure to comply with the Agreement by procuring the proper builder's risk insurance as required by paragraph 11.4.1 of the Agreement. Further, and in the alternative, Hunt argues that the School's Count Three for breach of good faith and fair dealing should be dismissed under the law of this case, and the School's Fifth Counterclaim, sounding in "Setoff," should be dismissed because no such cause of action exists under New Jersey law. Because I conclude that the School waived its claims against Hunt under ¶ 11.4.5 and ¶ 11.4.7, I do not reach these alternative arguments.

Under ¶ 11.4.5, "[i]f, during the construction period, the Owner insures properties . . . at or adjacent to the site by property insurance under policies separate from those insuring the Project, . . . the Owner shall waive all rights against [the Contractor] . . . for damages caused by fire or other causes of loss covered by this separate property insurance." Paragraph 11.4.5, further, states that "the Owner shall waive all rights *in accordance with the terms of Section 11.4.7* ...." (emphasis added).

The parties disagree as to what portion of 11.4.7 this "in accordance" language refers. The School argues that 11.4.5 refers to the custom language in 11.4.7—"caused by matters insured by Owner's 'Builder's Risk' insurance policy"— thereby limiting 11.4.5 to only those matters insured by an owner's builder's risk policy. Under the School's interpretation, 11.4.5 *would* read as follows:

> If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project . . . the Owner shall waive all rights ~~in accordance with the terms of Section 11.4.7~~ **caused by matters insured by Owner's "Builder's Risk" insurance policy** for damages caused by fire or other causes of loss covered by this separate property insurance.

The School summarizes its proposed interpretation as "if a separate property insurance policy covered damage to the Work being performed as part of the Project (*i.e.*, 'matters insured by Owner's Builder's Risk insurance policy'), then there would be a waiver of any claims between the parties related thereto." Def. Br. in Opp. to Pl. Mot. Summ. Jdmt. at 20. But, if the damage is to Non-Work property, the

School continues, "then this waiver provision is inapplicable pursuant to its own terms." Id.

Hunt, on the other hand, argues that the reference to 11.4.7 merely clarifies which persons and entities are covered by the waiver. Paragraph 11.4.5 does not specify to whom the waiver applies. Paragraph 11.4.7, however, does state to which persons and entities it applies:

> The Owner and Contractor waive all rights against . . . each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and . . . separate contractors described in Article 6 ….

(emphasis added). In Hunt's view, it is this language from 11.4.7 that 11.4.5 seeks to import.

The Court rejects the School's interpretation as a tortured and illogical reading of the combined texts. For one, its interpretation reflects an attempt to create a contractual exception out of whole cloth. There is no language in 11.4.5 that would suggest its terms be limited to damage to the Work.

In addition, the 11.4.5 text already addresses the type of insurance to which it applies: "the Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss *covered by this separate property insurance*." (emphasis mine). Courts have noted that the key difference between these two texts is that the 11.4.5 waiver applies to matters covered by property insurance *separate* from that insuring the Project while the 11.4.7 waiver applies to matters insured by insurance covering the Project. See e.g., Allianz Ins. Co. v. Structure Tone (UK), Inc., 03 Civ. 0833, 2005 U.S. Dist. LEXIS 44839, * 26

(S.D.N.Y. Aug. 15, 2005) ("Read together, the various provisions of paragraph 11 evoke a clear intent to preclude recovery of any damages covered by insurance. [Paragraph 11.4.7] waives . . . rights for any damage covered by insurance specific to the work contracted, and paragraph 11.[4].5 waives subrogation rights as to damages covered by insurance for the property generally.").  As the School itself argues, builder's risk insurance covers new construction on a project.  Def. Br. in Opp. to Pl. Mot. Summ. Jdmt. at 15.  Hence it is unworkable to read 11.4.5 as waiving rights "caused by matters insured by the Owner's 'Builders Risk' policy" when the plain text of 11.4.5 speaks to causes covered by "policies separate from those insuring the Project ...."  Incorporating the builder's risk policy language into 11.4.5 would make that paragraph internally inconsistent.

Because 11.4.5 limits itself to only those matters covered by property insurance distinct from that covering the Project, the only plausible reading of 11.4.5's *in accordance with the terms of Section 11.4.7*'s language is, as Hunt argues, to clarify to which persons and entities the waiver applies.  Under this interpretation, 11.4.5 *would* read:

> If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project . . . the Owner shall waive all rights ~~in accordance with the terms of Section 11.4.7~~ **against [the Contractor] and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and . . . separate contractors described in Article 6 ....** for damages caused by fire or other causes of loss covered by this separate property insurance.

As this example illustrates, the *in accordance* language simply clarifies that the 11.4.5 waiver applies to the Contractor, subcontractors, and other parties and entities named in 11.4.7.  This interpretation, in my view, is the logical one.

Furthermore, the School's contrary interpretation would undermine the purpose of the Agreement's risk allocation scheme.   Under the School's interpretation, an owner who did not purchase insurance or notify the contractor of its decision not to purchase would be released from its waiver under 11.4.5 and be entitled to sue the contractor and other persons/entities involved with the Project. By creating an escape clause for owners who fail to meet their insurance obligations, the School's interpretation would render ineffectual the insurance obligation provisions of the Agreement.

The School's reliance on non-binding, out-of-state case law in support of its interpretation does not alter my analysis.  The School points, specifically, to <u>Knob Noster R-VIII Schl. Dist. v. Dankenbring</u>, 220 S.W.3d 809 (Mo. Ct. App. 2007) and <u>Copper Mountain, Inc. v. Industr. Syst., Inc.</u>, 208 P.3d 692 (Co. 2009).  Both of these cases, however, are distinguishable and inconsistent with the approach I believe the New Jersey Supreme Court would take in interpreting the waivers here.

As an initial matter, the court in <u>Knob Noster</u> relied on the standard 11.4.7 language in interpreting the scope of the 11.4.5 waiver.  The unaltered 11.4.7 language provided that the parties waived all rights for "damages caused by fire or other causes of loss *to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work.*"  220 S.W.3d at

813 (emphasis added).  Here, however, the entire italicized phrase was deleted from the Agreement and the parties' custom language defines the scope of the waiver as "damages caused by matters insured by Owner's 'Builder's Risk' insurance policy."

The <u>Knob Noster</u> Court reasoned that the aforesaid italicized language made clear that the waiver applied only to those matters covered by builder's risk insurance (interpreting "insurance obtained pursuant to this Section 11.4" as referring to the Owner's obligation to obtain builder's risk ("all-risk") insurance in paragraph 11.4.1) or insurance "applicable to the Work."  It goes without saying that the deletion of that language in the parties' Agreement renders <u>Knob Noster</u>'s reasoning inapplicable here to the extent its reasoning is based on the italicized language.  Second, since there was no separate/existing property insurance policy in <u>Knob Noster</u>, its interpretation of 11.4.5 is *dicta*.  <u>Id.</u> at 820.

Moreover, I find the remainder of <u>Knob Noster</u>'s reasoning unpersuasive.  That court accepted the argument that the AIA General Conditions' inclusion of paragraph 11.1.1., which requires the Contractor to procure liability insurance to protect it "from claims . . . for damages, other than to the Work itself, because of injury to or destruction of tangible property ....," <u>id.</u> at ¶ 11.1.1.5, must be read in conjunction with 11.4.5 to mean that the latter applies only to Non-Work property.  Otherwise, the <u>Knob Noster</u> Court reasoned, "11.1.1 would not be necessary, as all claims would be barred and there would be nothing against which the contractor needed to be insured."  220 S.W.3d at 820.

In my view, the two provisions may be reconciled without creating a Work/Non-Work dichotomy not found in the text of ¶ 11.4.5. While ¶ 11.1.1 *requires* the Contractor to purchase insurance covering property damage to Non-Work property, ¶ 11.4.5 *permits* the Owner to purchase or maintain its existing property insurance separate from that insuring the Project. See 11.4.5 ("*If* . . . the Owner insures ...."). This means that, following <u>Knob Noster</u>'s rationale, ¶ 11.1.1 would indeed be necessary where an Owner did not hold separate property insurance.

Further, the plain text of paragraph 11.1.1.5 is not limited to the Owner's property. Rather, the contractor's liability insurance must cover claims for "damages . . . because of injury to or destruction of tangible property ...." regardless of whether that property is owned by the Owner, an employee, or a third party. The context of 11.1.1.5 supports this reading of the text—subparagraph .1 of 11.1.1 applies to worker's compensation claims by employees, subparagraph .2 applies, *inter alia*, to the occupational sickness claims of the Contractor's employees, and subparagraph .3 extends coverage to "any person other than the Contractor's employees." Other subparagraphs require coverage for property damage "arising out of ownership, maintenance or use of a motor vehicle," 11.1.1.6, and for property damage "arising out of completed operations." 11.1.1.8. These two subparagraphs do not include any "other than to the Work itself" limitation like that found in subparagraph .5, which omission suggests that both Owner and Non-Owner property negligently damaged by the Contractor must be covered by the Contractor's liability insurance policy. In light of ¶ 11.1.1's general applicability to

various parties, it is unreasonable to limit the text of subparagraph .5 to the destruction of the Owner's property when there is no such explicit limitation in the text.

More importantly, New Jersey courts have repeatedly enforced both 11.4.5 and 11.4.7, and analogous waiver language, where the Owner recovered losses from its property insurer. <u>Skulskie v. Ceponis</u>, 404 N.J. Super. 510 (App. Div. 2009); <u>Sch. Alliance Ins. Fund v. Fama Constr. Co.</u>, 353 N.J. Super. 131 (Law Div. 1998) <u>aff'd</u> 353 N.J. Super. 1 (App. Div. 2002); <u>Mayfair Fabrics v. Henley</u>, 101 N.J.Super. 363 (Law Div. 1968); <u>Carlson Rest. Worldwide, Inc. v. Designline Constr. Svcs.</u>, Docket No. A-506-07T3, 2009 N.J. Super. Unpub. LEXIS 2365 (N.J. App. Div. Sept. 4, 2009); <u>Kramer v. Fokis, Inc.</u>, Docket No. A-5833-05T5, 2007 N.J. Super. Unpub. LEXIS 410 (App. Div. May 21, 2007).[3] Federal and state courts in the Third Circuit have done the same. <u>Church Mutual Ins. Co. v. Palmer Constr. Co., Inc.</u>, 153 Fed. Appx. 805 (3d Cir. 2005); <u>Commercial Union Ins. Co. v. Bituminous Cas. Corp.</u>, 851 F.2d 98 (3d Cir. 1998) (applying New Jersey law); <u>Cont'l Casualty Ins. Co. v. Darella Elec., Inc.</u>, Civil Action No. 08-683, 2010 U.S. Dist. LEXIS 11437 (D.N.J. Feb. 9, 2010) (applying Georgia law); <u>Argonaut Great Centr. Ins. Co. v. DiTocco Konstruction, Inc.</u>, Civil Action No. 06-1488, 2007 U.S. Dist. LEXIS 93846 (D.N.J. Dec. 21, 2007) (applying New Jersey law); <u>Jalapenos, LLC v. GRC Gen. Contr., Inc.</u>, 2007 PA Super 391 (Super. Ct. 2007).

---

[3]    I reference unpublished New Jersey court decisions as persuasive authority because, under New Jersey Court Rule 1:36-3, these decisions are not binding on New Jersey courts.

Indeed, New Jersey and the surrounding state courts of Pennsylvania and New York each highlight the strong policies underlying the enforcement of waiver provisions like that found in the Agreement here.  By way of background, the Third Circuit in St. Paul Fire v. Turner Constr. Co., 317 Fed. Appx. 219 (3d Cir. 2009), described risk allocation in a typical AIA construction contract:

> On a construction project, the contractor risks liability for negligence and the owner risks damage to its property. The contractor purchases liability insurance and the owner purchases property insurance.  If the contractor damages the owner's property, the owner or its property insurer (as subrogee) may sue the contractor for negligence.  To prevent such litigation, an owner may waive its rights against the contractor for property damage to the extent covered by the owner's property insurance.  This assigns losses from property damage caused by the contractor's negligence exclusively to the owner's property insurer (again, to the extent it pays the owner for damages incurred).

Id. at 220.  That court went into interpret the waiver in that case, which utilizes similar language to ¶ 11.4.7 here, as precluding the Owner from suing the Contractor for water damage to the Owner's building due to the negligence of a subcontractor.  While the court in St. Paul Fire did not explicitly discuss paragraph 11.1.1, its risk allocation synopsis makes clear that it perceives no duality in an AIA agreement directing the Contractor to procure liability insurance and permitting the Owner to purchase property insurance.

New Jersey courts, in particular, repeatedly note that the purpose of a mutual waiver scheme, like that found here, "is to assure that, to the extent any loss is covered by a policy, the insurer should bear the risk of loss, regardless of any

fault on the part of one or both of the parties.  Another purpose is to prevent a potential windfall to [one party] against the other parties to the contract."  <u>Schl. Alliance</u>, 353 N.J. Super. at 140.  As explained by the court in <u>Continental Ins.</u>,

> the modern judicial view that provisions in . . . commercial agreements . . . whether couched in language of indemnity or exculpation or imposing obligations with respect to obtaining insurance, are to be viewed realistically as normal common-sense efforts by businessmen to allocate between them the cost or expense of risks of property damage.

288 N.J. Super. at 350-51 (quoting <u>Mayfair Fabrics</u>, 97 N.J. Super. 116, 123).[4] Simply put, where "the parties intended to shift the risk of loss to insurance policies which they undertook to procure," waivers will be enforced by the courts.  <u>Id.</u> at 351; <u>id.</u> at 352 ("[B]usiness people have the right to determine that the risks of a transaction shall be borne by insurance.").  Thus, such waivers must be interpreted with these purposes in mind.

The reading proposed by <u>Knob Hill</u> would not effectuate the purpose of mutual waivers as framed by the New Jersey courts.  By limiting ¶ 11.4.5 to "Work" property, the waiver would preclude the Owner from suing the Contractor for damage to the Work but permit the Owner to sue for damage to Non-Work property. Such disparate treatment would undermine the effectiveness of the waiver and result in protracted litigation between the parties as to what constitutes Work versus Non-Work.  <u>Accord</u> <u>Allianz Ins.</u>, 2005 U.S. Dist. LEXIS 44839 at * 21

---

[4]      Based on this sort of policy, one New Jersey court even upheld a mutual waiver scheme in a condominium community where the damaged property owner was not obligated to purchase insurance.  <u>Skulskie</u>, 404 N.J. Super. at 514.

("[R]ather than promoting certainty as to the liability of the parties to these standard contracts, [such a] construction of this standard waiver clause invites litigation as to whether the damages in any particular case fall within the scope of the work to be performed under the contract.") (quoting S.S.D.W. Co. v. Brisk Waterproofing Co., Inc., 76 N.Y.2d 228, 237 (1990) (Alexander, J., dissenting)). Because one of the key purposes of the waiver provisions is to forestall litigation, I cannot subscribe to the Knob Hill Court's interpretation of ¶ 11.4.5.

As for Copper Mountain, that court, like Knob Hill, interpreted the standard AIA 11.4.7 provision and concluded that its waiver was limited to damages to "the Work" property. In this regard, it is distinguishable in the same manner as Knob Hill, in light of the custom Agreement language here. But, for the sake of completeness, I address Copper Mountain's additional rationale that ¶ 11.4.5 is not applicable to existing property insurance but only to that insurance procured "during the Project construction period."

The Copper Mountain Court reasoned that 11.4.5's *during the construction period* language must be read as a temporal requirement. 208 P.3d at 699. I disagree with this aspect of Copper Mountain's analysis because it deviates from the plain text of 11.4.5. Paragraph 11.4.5 states that the Owner waives its rights "[i]f during the Project construction period, the Owner *insures* properties . . . under policies separate from those insuring the Project ...." The language does not state, as Copper Mountain presumes, that the waiver applies if the Owner *procures* policies during the construction period. Rather, the paragraph's present tense use of

"insures" suggests only that the separate policy is in existence during the Project, not that it was procured during the Project.

And, as with <u>Knob Hill</u>, there is law in New Jersey and the Third Circuit strongly suggesting that New Jersey courts would reject <u>Copper Mountain</u>'s analysis of the AIA waiver provisions. For one, New Jersey strongly favors enforcement of these sorts of waiver provisions as described *supra*. A Third Circuit opinion applying Pennsylvania law, further, holds that "if [a] property owner relies on a pre-existing insurance policy that covers both 'work' and 'nonwork' property, it waives the right to sue for all damages done ...." <u>Church Mut. Ins. Co</u>, 153 Fed. Appx. at 809 (quoting <u>Emp. Mut. Cas. Co. v. A.C.C.T., Inc</u>., 580 N.W.2d 490, 493-94 (Minn. 1998)) (internal quotation marks omitted). <u>Copper Mountain</u> reached the opposite conclusion, holding instead that a pre-existing policy that covers both Work and Non-Work property is not "separate" or procured during the Project construction period.   208 P.3d at 700.   The New Jersey Supreme Court, in my estimation, is likely to reject <u>Copper Mountain</u>'s rationale and follow, instead, the contrary interpretation in <u>Church Mutual</u>.

Finally, the School argues that the Agreement's indemnification provision, found in 3.18.1, would be rendered a nullity if 11.4.5 and 11.4.7 are interpreted to apply to Non-Work property damage.   Paragraph 3.18.1 provides that "the Contractors shall indemnify and hold harmless the Owner . . . against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work ...."   As an initial matter, I note

25

that 11.4.7 expressly states that its waiver "shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification …." such as that imposed by 3.18.1.

I, further, find the School's argument untenable because indemnification provisions such as 3.18.1 relate to the reimbursement of expenses incurred in connection with defending *third-party* claims. See Continental Cas. Ins., 2010 U.S. Dist. LEXIS 11437 at *18; Jalapenos, 2007 PA Super at *P14 n.2 ("A clause which contains the words 'indemnify' and 'hold harmless' is an indemnity clause which generally obligates the indemnitor to reimburse for any damages the indemnitee becomes obligated to pay third persons.  Indemnification agreements ordinarily relate to third-party claims.").  Indeed, the Third Circuit, in Church Mutual, expressly rejected the argument the School makes here, noting that an analogous AIA indemnification provision must be interpreted to apply only to claims brought by third parties and, therefore, does not render the waiver provisions null.  153 Fed. Appx. at 808.  Accordingly, I reject the School's argument that the existence of the 3.18.1 indemnification suggests that 11.4.5 and 11.4.7 should be limited to Non-Work property damage.

In addition, the School argues that other provisions relating to the Contractor's site maintenance and insurance obligations under the Agreement would be rendered illusory if the ¶ 11.4.5 waiver is read to apply to Non-Work property damage.  The Third Circuit rejected this argument also, in Church Mutual, holding that each of the various provisions in the standard AIA agreement relating

26

to the Contractor's responsibilities to maintain a safe work site (¶ 10.2), and purchase liability insurance (¶ 11.1), when read "in isolation and in context," do not conflict with the waiver provisions found in ¶¶ 11.4.5 and 11.4.7.  Accord 153 Fed. Appx. at 808-09 (interpreting analogous AIA provisions under Pennsylvania law).  I, likewise, reject the School's argument here.

In sum, because the School acknowledges that its general property insurer has agreed to pay for the damage to the gym floor relating to the July 2006 flood, the School has waived any causes of action against Hunt related to those damages. This leaves only the damages caused by the July 2007 flood.  Hunt has failed to point to anything in the record indicating that the School's general property insurer has agreed to cover the damage from that flood.  Thus, its motion for summary judgment on ¶ 11.4.5 waiver grounds is granted only with respect to the July 2006 damages.  I must now turn to Hunt's alternative arguments for summary judgment on the July 2007 claim.

b.      Waiver under Paragraph 11.4.7

I now turn to whether paragraph 11.4.7 applies to the School's July 2007 flood damage.  The custom terms of paragraph 11.4.7 provide that the Owner waives all rights for "damages caused by *matters insured by Owner's 'Builder's Risk' insurance policy* …." (emphasis added).  Cases interpreting this subparagraph address the standard 11.4.7 language, which states that the Owner waives all rights for "damages caused by fire or other causes of loss *to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property*

27

*insurance applicable to the Work* ....," and are therefore distinguishable.  So, my analysis must focus squarely on the custom contract language presented here.

In my view, paragraph 11.4.7, as drafted here, serves to bar the Owner's claim.  The plain language of the custom paragraph 11.4.7 states that it applies to "damage caused by matters insured by Owner's 'Builder's Risk' insurance policy." Although there was no policy in place here, because the School retroactively cancelled the policy such that no coverage was in place for the July 2007 flood, my assessment of New Jersey case law is that the waiver scheme here would be upheld despite the School's retroactive cancellation.

New Jersey courts accord great weight to waiver language when such language is part of an overall risk allocation scheme.  For example, in <u>Skulskie v. Ceponis</u>, <u>supra</u>, a recent Appellate Division case, the court addressed whether a waiver in a condominium's by-laws applied when a condominium owner did not procure homeowner's insurance for his unit.  Under the risk allocation scheme created by the condominium's by-laws, each owner was granted the option of purchasing homeowner's insurance.  <u>Id.</u> at 512.  The by-law waiver language mandated that any insurance policies purchased contain a provision that "the insurer waives its rights of subrogation as to any claims against Unit Owners ...." <u>Id.</u>

Concluding that the waiver applied even where a condominium owner did not procure insurance.  The court reasoned:

> In light of the overall purpose of the waiver of subrogation
> provision in any insurance policy obtained by the unit

> owner, we discern no basis to allow the insurance carrier of the damaged unit owner to proceed against another unit owner, even an uninsured unit owner. *The scheme created by this residential condominium community contemplated no litigation between unit owners* or between unit owners and the Association. The optional nature of the insurance scheme does not alter the purpose of the waiver of subrogation provision.

Id. at 514 (emphasis added).  Furthermore, the court continued, "when an insurer . . . issues a policy [under these terms], it does so with the understanding that it has no recourse against a negligent unit owner." Id.

Similarly, here, the scheme created by the Agreement contemplated no litigation between the Owner and the Contractor for property damage.  Paragraph 11.4.7's language envisions that the risk of construction damage is allocated to the Owner's builders' risk insurer.  Where the Owner failed to purchase that insurance, it was obligated under 11.4.1.2 to notify the Contractor so that the Contractor could purchase the insurance.  If the Owner does not purchase the insurance, it becomes liable for "all reasonable costs properly attributable thereto."  Agreement, ¶ 11.4.1.2.  Taken together, this language strongly suggests that the Agreement envisions insurance being in place, and that the burden falls on the Owner in the event no such insurance is procured.  Moreover, the custom language here deletes the standard language that limits the waiver to "damages caused . . . *to the extent covered by property insurance* …." (emphasis mine).  By deleting the "to the extent language" here, the parties indicated that they did not intend to limit the waiver provision to damage actually covered by the builder's risk policy.

As in <u>Skulskie</u>, the waiver provision here is most effective when applied universally, even where an Owner prematurely cancels the builder's risk policy.  In <u>Skulskie</u>, the facts are even more striking than those presented here in that the purchase of insurance was not mandatory—the condominium owner there had the option of purchasing the insurance.  Nonetheless, the court held that "[t]he optional nature of the insurance scheme [did] not alter the purpose of the waiver . . . provision."  404 N.J. Super. at 514.  The facts here, where the purchase of insurance was mandatory, present an even stronger case for the uniform enforcement of the waiver provision.  <u>Accord</u> <u>Jalapenos</u>, 2007 PA Super at *P9 (holding that, pursuant to ¶ 11.4.7, the Owner waived any claims against the Contractor where the Owner failed to procure insurance as required by the Contract Documents).  Lastly, as in <u>Skulskie</u>, the Owner here was well aware when it signed the Agreement that it was waiving its rights to sue the Contractor for negligent work.

In short, paragraph 11.4.5 contain strong waiver language that is of the nature that has been consistently upheld by courts, and I see no reason to employ a contrary interpretation of that language in this case.  Accordingly, I grant Hunt's motion for summary judgment under paragraph 11.4.7 with respect to the July 2007 flood, and dismiss each of the School's remaining counterclaims.

### 2.   <u>Hunt's Breach of Contract Claim</u>

Having concluded that the School's counterclaims must be dismissed, I now turn to Hunt's motion for summary judgment on its breach of contract claim.  "To establish a breach of contract claim, a plaintiff has the burden to show that the

parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." Murphy v. Implicito, 392 N.J.Super. 245, 265 (App. Div. 2007). The School's refusal to pay the remaining $317,013 due under the Agreement clearly violates its payment obligation. Hunt has sustained damages as a result of the School's failure to pay; thus, summary judgment is appropriate for the School's failure to pay in the amount of $317,013.

In addition, Hunt argues that it is entitled to recovery under paragraph 11.4.1.2 based on the School's failure to maintain the builder's risk policy. The July 2007 flood occurred while this policy was not in effect as a result of the School's retroactive cancellation. Hunt is not entitled to recovery under 11.4.1.2, however, because it cannot show that it has borne costs attributable to the School's failure to maintain insurance. It was the School—not Hunt—that paid to have the floor repaired after the July 2007 flood.

Hunt seeks to avoid this result by arguing that it has incurred attorney's fees and costs in connection with this suit, and that this suit originated out of the floods and the School's decision to withhold funds. Such "damages" are far too attenuated from 11.4.1.2's plain language. The sentence preceding the "damages" language provides that, should the Owner notify of its failure to procure insurance, "[t]he Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors *in the Work* …," Hence the damages language must be read in light of this provision. Thus, in my view, the

31

plain language of the provision, read in context, does not support the damages sustained in prosecuting a lawsuit to recover monies from the Owner that result from a dispute about liability for the non-insured damage.  Rather, the damages to which the provision refers is damage to the Contractor's Work.  As no such damages are alleged here, Hunt is not entitled to summary judgment for its costs and fees.

**B.    The School's Cross-Motion for Partial Summary Judgment on its Declaratory Judgment, Breach of Contract, Contractual Indemnification, and Setoff Claims**

Because the School's counterclaims have been dismissed, its cross-motion on those same counterclaims has now become moot and is, accordingly, denied.

**C.    G.R. Murray's Motion for Summary Judgment against the School on the School's Negligence Claim**

1.    <u>Facts</u>

In its Third Party Complaint, the School brings a negligence claim against G.R. Murray.  Its negligence count alleges that the School retained G.R. Murray to "assist it in obtaining the insurance policies required under the Agreement with Hunt Construction."  Third-Party Compl., ¶ 4.  In that the Agreement required the School to "purchase and maintain . . . property insurance written on a builder's risk 'all-risk' or equivalent policy . . . comprising total value for the entire Project at the site ....," <u>id.</u> at ¶ 5 (quoting Section 11.4.1 of the General Conditions to the Agreement), the School asserts that G.R. Murray breached its "duty to the Hun

School to ensure that the Hun School purchased the correct and necessary insurance polic[y]." Id. at ¶ 10.

More specifically, the School asserts that G.R. Murray advised it to purchase a Builder's Risk Policy from Excelsior Insurance Company. Id. at ¶ 6. That policy explicitly excluded damage to "existing buildings or structures to which additions, alterations, improvements, or repairs are to made ...." Id. at ¶ 8. As noted, in July 2006, and a second time in July 2007, the School's gymnasium flooded, which caused the gymnasium floor to warp and couple. See Countercl., ¶¶ 25, 26. The School incurred $274,864.78 to repair the floor. Id. at ¶ 27.

After the School submitted a claim under the Builder's Risk Policy, its claim was denied because the insurer determined that the floor's damage fell within the exception for damage to existing structures. Third-Party Compl., ¶ 8. To the extent that Hunt Construction seeks to hold the School liable under the Agreement for failure to purchase the proper insurance, the School seeks to hold G.R. Murray responsible for the lack of coverage. Id. at ¶ 13.[5]

### 2.   Affidavit of Merit

New Jersey's Affidavit of Merit ("AOM") statute "require[s] plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in

---

[5]      "[I]f it is determined as claimed by Hunt Construction that the damage to the Floor caused by the July 2006 and July 2007 [flood] was required to be insured by the builder's risk insurance policy the Hun School was required to purchase under Section 11.4.1 of the General Conditions to the Agreement, [any costs incurred by the Hun School] would be the result of [G.R. Murray's] negligence in failing to provide proper advice and recommendations to the Hun School as to the insurance policies the Hun School was required to purchase under the Agreement."

order that meritless lawsuits readily could be identified at an early stage of litigation." In re Petition of Hall, 147 N.J. 379, 391 (1997). One goal of the statute is that "the resources and time of the parties will not be wasted by the continuation of unnecessary litigation." Knorr v. Smeal, 178 N.J. 169, 176 (2003). In pertinent part, the statute provides that

> [i]n an action for damages for . . . property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised . . . fell outside acceptable professional . . . standards.

N.J.S.A. 2A:53A-27.  The statute, further, provides for a 60-day extension "upon finding of good cause." Id.  Where no affidavit is timely provided, a defendant may move for dismissal of the complaint.

New Jersey courts have interpreted the AOM statute to apply to those claims that "require proof of a deviation from the professional standard of care for that specific profession." Couri v. Gardner, 173 N.J. 328, 341 (2002). In ascertaining whether the claims require such proof, courts must look to the underlying factual allegations, and not how the claim is captioned in the complaint.  Id. at 339.  So, that a claim is labeled "negligence" or "breach of contract" is not dispositive; it is the nature of proof required that controls. Id. at 341.

Where the allegations do not require proof of a deviation from a professional standard of care, no affidavit is required.  Cases fitting this categorization are

referred to as "common knowledge" cases. See Hubbard v. Reed, 168 N.J. 387, 394-95 (2001) ("[A] plaintiff in a common knowledge malpractice case will not need expert testimony at trial to establish the standard of care or a deviation therefrom.").  Here, the Hun School acknowledges that it did not timely file an AOM in the instant suit, but argues that the common knowledge exception brings its claim outside of the purview of the statute.

a.   <u>Necessity of Affidavit</u>

As an insurance broker, G.R. Murray is entitled the protections of the AOM statute, see Syndicate 1245 at Lloyd's v. Walnut Advisory Corp., --- F.Supp.2d ---, 2010 WL 2651289, *7 (D.N.J. Jun. 24, 2010); Boerger v. Commerce Ins. Svcs., 2005 WL 2901903, *2 (D.N.J. Nov. 1, 2005), unless the Hun School's allegations can be proven without reference to the professional standards governing insurance producers.  The School cites to Greenblatt v. Kissel, 2005 WL 3747582, *1 (N.J. Super. App. Div. Feb. 9, 2006), an unpublished New Jersey decision, in support of its argument that its negligence allegations can be proven by calling on a juror's common knowledge.

Greenblatt involved allegations related to the transmittal of an insured's policy notices to the wrong address.  That court held that the common knowledge exception applied because "the transmittal of notices regarding [the plaintiff's] coverage to obviously wrong addresses are matters that jurors, using ordinary understanding and experience, can determine without the benefit of the specialized knowledge of experts."  2005 WL 3747582 at *3.  Other decisions applying New

35

Jersey law have concluded that the common knowledge exception may apply to claims brought against insurance professionals, such as when it is alleged that a broker procured the wrong amount of coverage.  See Boerger, 2005 WL 2901903 at *1.

As explained in detail in my ruling in Syndicate 1245 at Lloyd's, 2010 WL 2651289 at *8-13, there are conflicting decisions in this area of law.  Nevertheless, it is clear that New Jersey "treats insurance brokers as fiduciaries for their lay clients [in light of] the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies."  Id. at *9 (quoting Aden v. Fortish, 169 N.J. 64, 78 (2001)).  Furthermore, the Agreement language that the School asserts G.R. Murray failed to properly interpret is beyond the province of a common jurors understanding:

> Property insurance shall be on an 'all-risk' or equivalent policy form, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements ….

Agreement, ¶ 11.4.1).  Importantly, this language does not define "all-risk" nor does it explicitly state that the policy must cover existing buildings or structures.  To ascertain whether the School's allegations that G.R. Murray failed to procure a policy consistent with this contract language, a juror would be required to use more than the ordinary understanding and experience needed to understand notices

transmitted to the wrong address, or a policy purchased for the wrong amount. Accordingly, I conclude that the School's allegations against G.R. Murray are the sort of allegations that require an affidavit of merit under New Jersey law.

In addition, the School argues that expert testimony is not necessary because its third party claim against G.R. Murray is predicated on a finding of liability against it in the primary suit between Hunt and the School.  In this regard, the Schools appears to argue that its claim against G.R. Murray is effectively one for indemnification.  Before the claim against G.R. Murray could proceed, so goes the Schools' argument, the Court would be required to first interpret the Agreement, thereby defining "all-risk" policy, and to conclude that the School's policy failed to provide the requisite coverage.   Pl. Opp. at 7.  Therefore, the School continues, all that a jury would be required to determine is whether "G.R. Murray was responsible for procuring all of the Hun School's insurance, had the [Agreement], was aware of its terms, was aware of the nature of the renovations and communicated it to the insurer, and knew but failed to discuss with the Hun School that different options were available."  Id.  As revealed by prior rulings in this opinion, however, the Court has not been required to rule upon whether the School's builder's risk policy satisfied ¶ 11.4.1's dictates in order to adjudicate the co-pending motions.  Rather, the Court denied Hunt's request for summary judgment on ¶ 11.4.1 by concluding that Hunt failed to demonstrate it suffered damages.  Thus, this aspect of the School's argument necessarily fails.

The School is correct that a juror may rely on its own general knowledge and experience to determine that the School retained G.R. Murray, and that the School directed G.R. Murray to procure insurance in accordance with the Agreement. Nonetheless, a juror could not rely on generalized knowledge and experience to determine whether G.R. Murray breached the standard of care in interpreting the Agreement's insurance procurement language. Nor could a juror rely on generalized knowledge and experience to determine whether G.R. Murray should have known that an exclusion for existing structures was inconsistent with the Agreement's language. Furthermore, to determine whether G.R. Murray breached the standard of care by failing to advise the School of all the various insurance policies available to it, a juror would require the aid of expert testimony to understand the standard of care applicable to insurance brokers.

b.    Estoppel and Laches

In the alternative, the School argues that G.R. Murray "slept on its rights" and should now be equitably stopped from raising the affidavit of merit argument, citing to Knorr v. Smeal, supra, in support of its argument. In Knorr, the New Jersey Supreme Court held that a defendant in a medical malpractice action was equitably estopped from moving to dismiss the plaintiff's complaint, for failure to file an AOM, based on the defendant's litigation conduct. Id. at 179. "Equitable estoppel," according to that court, "is an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law." Id. at 178 (quoting Casamasino v. City of Jersey City, 158 N.J. 333, 354 (1999)). "[T]o establish equitable estoppel,

[a] plaintiff must show that [the] defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that the plaintiffs acted or changed their position to their detriment."  Id. (citing Miller v. Miller, 97 N.J. 154, 163 (1984)).

The facts in Knorr were that the plaintiff obtained an AOM several weeks after the deadline for serving the AOM, id. at 175, filed an expert report "detailing how [the] defendant' conduct deviated from the standard of care and fell below acceptable medical standards," id., both plaintiff and defendant were deposed, oral argument was held on a discovery matter, and the plaintiff submitted to a defense expert physical exam.  Id.  The discovery deadline passed, as well as the deadline for dispositive motions.  Then, after all the foregoing discovery had taken place and the dispositive motion deadline passed, the defendant moved to dismiss for failure to file an AOM.

Other unpublished cases applying New Jersey law, with similar facts, have relied upon the equitable estoppel doctrine to bar a defendant from moving to dismiss for failure to file an AOM.  See e.g., Bruen v. Morristown Mem. Hosp., Docket No. L-99-06, 2009 WL 1650297 (N.J. Super. App. Div. Jun. 15, 2009) (defendant filed motion near the end of difficult and comprehensive discovery and thirteen months after AOM deadline, and after defendant had opportunity to verify the validity of plaintiff's claim); Mottola v. City of Union City, Civil Action No. 05-CV-3964, 2008 WL 755977 (D.N.J. Mar. 19, 2008) (motion filed after interrogatories, depositions, and examination of the plaintiff by defendant's medical

expert and twenty months after AOM deadline).   Underlying these equitable estoppel decisions is the notion that the New Jersey legislature did not envision that "a defendant would run a plaintiff through the discovery process, learn that the complaint was supported by competent evidence and an expert's report, and only then move to dismiss on the technical ground that the plaintiff failed to clothe the expert opinion in the form of an affidavit."   Knorr, 178 N.J. at 176-77.

On the other end of the spectrum is Stoecker v. Echievarria, 408 N.J.Super. 597 (App. Div. 2009), where the New Jersey Appellate Division rejected a plaintiff's equitable estoppel argument in the AOM context.   In that case, the plaintiff late-filed an AOM and the defendant filed its motion to dismiss within two months of the AOM deadline.   Only limited paper discovery had taken place, and the plaintiff had not yet been deposed.   Thus, according to the Stoeker Court, the defendant "never led plaintiff to believe that she had a viable claim, nor did she sit back while plaintiff incurred extensive costs in pursuing the claim against her."   Id. at 615.

The School argues that the facts here are sufficiently similar to those in Knorr to justify application of the equitable estoppel doctrine here.   G.R. Murray waited over eighteen months to challenge the School's failure to file an AOM, it argues, and discovery has closed.   The parties engaged in substantial paper discovery and depositions were taken, the School notes.   Indeed, these facts are similar to those in Knorr and the other unpublished cases I have cited.

One key difference between those cases and the facts here, however, is that the School never obtained an AOM or expert report in support of its negligence

claim, arguing instead that the common knowledge doctrine applied.  The School's failure to supply an AOM or expert report is significant because it suggests that G.R. Murray may not have "learn[ed] that the complaint was supported by competent evidence and an expert's report, and . . . then move[d] to dismiss on the technical ground that the plaintiff failed to clothe the expert opinion in the form of an affidavit."  Knorr, 178 N.J. at 176-77.

That said, G.R. Murray still waited eighteen months to file its motion after the conclusion of paper discovery and depositions.  Had G.R. Murray moved earlier in the proceeding, Plaintiff would have avoided those expenditures.  And, by failing to move earlier, G.R. Murray induced the School to believe that no such motion would be filed.  Accordingly, I find that the elements of equitable estoppel are met here, *i.e.*, G.R. Murray engaged in conduct that induced the School to engage in costly discovery to their detriment.

### 3.    Lack of Expert Testimony

My analysis does not end here, however.  As G.R. Murray correctly points out, its motion for summary judgment is not based solely on Plaintiff's failure to file an AOM.  G.R. Murray, further, argues that its motion for summary judgment is also based on the School's failure to provide expert reports.  See Rab v. Doner, Docket No. A-2911-09T3, 2010 N.J. Super. Unpub. LEXIS 1622 (App. Div. Jul. 19, 2010) ("[T]he [Knorr v. Smeal, supra] doctrines of laches and equitable estoppel do not bar the defense from challenging the sufficiency of plaintiff's expert reports on motions for summary judgment.").  Its arguments in support of this aspect of its

motion mirror that made in support of the AOM aspect because both revolve around whether the School may prove its claims by relying on the jury's common knowledge.   Thus, for the same reasons explained above in connection with my AOM analysis, I conclude that the School may not rely on the jurors common knowledge to prove its negligence claim against G.R. Murray.   For this reason, G.R. Murray's motion for summary judgment is granted.

### D.   Interstate's Motion for Partial Summary Judgment on its Breach of Contract Counterclaim

As noted, Hunt subcontracted work to Interstate on the Project.   Just prior to the July 2006 flood, Interstate completed grading and excavation work near the outside of the School's gymnasium.   According to the School, Interstate's failure to comply with all specifications applicable to its work either caused or contributed to the flood damage to the gymnasium in both July 2006 and July 2007.   Specifically, the School contends that Interstate did not properly grade the modular walls on the road to the north of the gymnasium.   See Mitchell Decl. in Supp. Def. Opp. to Pl. Mot. Summ. Jdmt., Exh. C, Morante Dep. 34:23 – 36:18: 124:6 – 124:12.   When the storm came through in July 2006, the School further contends, Interstate's acts and omissions caused the gymnasium to flood.[6]

In response to Hunt's "Fourth-Party Complaint" against Interstate seeking common law and contractual indemnification based on the School's counterclaims

---

[6]    Notably, the School does not contend that Interstate caused or contributed to the second flood in July 2007; it assigns fault for that flood to a different subcontractor not party to this suit.   See Hun School Opp. Br. to Hunt's Mot. Summ. Jdmt. at 9.

against Hunt for the flood damage, Interstate filed its own counterclaim against Hunt for breach of contract.  By way of motion for partial summary judgment on that claim, Interstate now argues that it is entitled to the contract balance due ($163,839.05) under its subcontract agreement with Hunt ("the Subcontract").

In its opposition papers, Hunt agreed that it would pay over the monies due Interstate once it received the funds withheld by the School.  Pl. Opp. To Interstate's Mot. Part. Summ. Jdmt. at 9, n.15 ("If Hunt is able to recover an amount from Hun School in this action sufficient to be made whole, Hunt will remit the remainder to Interstate to the extent of the remaining Subcontract balance.")  Arguably, Hunt was not obligated to pay Interstate until it received the funds withheld by the School on account of Interstate's allegedly defective work.  See Subcontract at 4.2 (pay-when-paid clause).  Now, because the Court has ruled that the School must pay over the $317,013 it withheld from Hunt, Interstate's motion based on Hunt's refusal to pay is moot.  The Court, therefore, directs Hunt to pay over the $163,839.05 due Interstate once it receives the $317,013 from the School.

E.    **Hunt's Motion for Summary Judgment against Interstate on its Indemnification Claim under the Subcontract**

In connection with this motion, Hunt argues that it is entitled to summary judgment on its Fourth-Party indemnification claim against Interstate.[7]  Specifically, Hunt relies on section 33.1 of the Subcontract, which provides:

---

[7]    For similar reasons that the School waived its counterclaims against Hunt, there is an argument that Hunt waived its indemnification claims against Interstate pursuant to ¶ 11.4.7 of the Agreement.  That paragraph explicitly states

43

> Subcontractor shall defend, indemnify, and hold harmless Hunt [and] the Owner . . . against any and all claims arising directly or indirectly out of Subcontractor's Work . . . including, but not limited to, claims for:
>
> (c) damage to property;
>
> (d) defects in material or workmanship; . . .
>
> (k) damage to other contractors, subcontractors, suppliers or any other person or entity.
>
> It is the intent of this Subcontract that Subcontractor defend, indemnify, and hold harmless Hunt, the Owner and such other persons or entities as the Contract Documents may require . . . Subcontractor is not obligated to defend, indemnify and hold harmless Hunt or Owner for their sole negligence or willful misconduct *if such indemnification is contrary to law* ….

Subcontract, ¶ 33.1.  Hunt further relies on section 33.5 to specify what sort of costs may be recovered under section 33.1.

Interstate first argues that summary judgment must be denied because there exists a genuine issue of material fact as to whether Interstate caused the flood damage.  This fact is critical, Interstate continues, because N.J.S.A. 2A:40A-1 bans contractual language that seeks to indemnify a party for its sole negligence.  Thus, if it were determined that Hunt's negligence caused the flood damage, Hunt's reliance on section 33.1 would be contrary to New Jersey public policy as expressed in that statutory provision.  Interstate also relies upon the New Jersey Supreme

---

that any subcontracts must include "similar waivers" that "shall be effective . . . even though [one] . . . would otherwise have a duty of indemnification …." Interstate, however, has not made this waiver argument so I will not address its applicability to Hunt's indemnification claim here.

Court's decision in <u>Azurak v. Corporate Property Investors</u>, 175 N.J. 110 (2003), to argue that the Subcontract's "contrary to law" language is ambiguous.  Interstate, further, argues that Hunt's reliance on section 33.1 is inappropriate because Hunt did not tender its defense to Interstate, and did not give timely notice of the School's suit.  In this connection, Interstate cites <u>Mantilla v. NcMall Assoc.</u>, 167 N.J. 262, 273 (2001).

As to Interstate's notice contention, the Court quickly dispenses with that argument.   Hunt correctly points out that its filing of the cross-claim for indemnification constituted sufficient notice to Interstate.  <u>See</u> <u>Mettinger v. Globe Slicing Machine Co., Inc.</u>, 153 N.J. 371, 389-90 (1998).  The <u>Mettinger</u> Court notes that the notice requirement is a due process concern, and that "a party's due process rights are not violated if it is held liable for a judgment arising out of an action in which it participated or had the opportunity to be heard." <u>Id.</u> at 389.  Moreover, the record demonstrates that Hunt sent a letter to Interstate, prior to filing its cross-claim, in August of 2007, thereby providing Interstate with sufficient notice.  Morante Reply Decl. at ¶ 3, Exh. 2 at 2.  <u>Mantilla</u>, cited by Interstate, does not compel a contrary result as that decision addressed only whether "an indemnitee who has defended against allegations of its own independent fault may not recover the costs of its defense from an indemnitor," 167 N.J. at 275, and did not set forth any notice requirement.

As to Interstate's reliance on the genuine dispute regarding causation, Hunt argues that Interstate has failed to point to any record evidence suggesting that

Hunt is solely responsible for the flood damage.  On this point, Hunt is correct.  It is not enough for Interstate to merely posit that Hunt is solely liable; it must point to record evidence to demonstrate the existence of a genuine dispute of material fact. Because Interstate has failed to create a genuine issue of material fact as to Hunt's sole negligence, the Court need not address whether the indemnification provision it contrary to New Jersey public policy.

That said, while the Court rejects Interstate's arguments, the Court find Hunt's reliance on section 33.1 inappropriate.   Indemnification clauses like that found in section 33.1 are typically found in construction agreements, and are

> clearly intended to protect the general contractor (as well as the owner and architect) from suits brought by third parties who are injured by acts of the subcontractors, *as opposed to claims among the contracting parties against each other.*

St. Paul Fire, 2003 WL 139775 at *7 (emphasis added); see also Church Mutual, 153 Fed. Appx. at 808 (interpreting AIA indemnification provision as applicable only to third parties).  There is nothing in section 33.1 that suggests its indemnification language should be read to apply to claims brought by the Owner, as opposed to those brought by a third party.    To the contrary, the language of section 33.1 suggests that it refers to claims brought by third parties *against* the contractual parties:  "It is the intent of this Subcontract that Subcontractor *defend, indemnify, and hold harmless Hunt, the Owner and such other persons or entities as the Contract Documents may require* ...."  (emphasis added).

The provision in the Subcontract that properly governs Hunt's indemnification claim is section 27.1, which addresses claims brought *by* the Owner against Hunt.[8]  It reads:

> *If the Owner* or a third party brings a claim against Hunt and such claim arises directly, or indirectly, in whole or in part from Subcontractor's Work or other involvement in the Project, Subcontractor shall:
>
> . . .
>
> (c):  indemnify and hold Hunt harmless from the cost of any judgment or settlement of such claim, Hunt's reasonable costs in responding to the claim, and Hunt's reasonable attorneys' fees and disbursements.

Under subsection (c) of this provision, Hunt is entitled to reimbursement for its costs and attorneys' fees/disbursements in defending against the School's counterclaims based on Interstate's alleged defective work.  To be clear, nothing in the provision's language suggests that Hunt is entitled to reimbursement for its costs and fees in prosecuting its affirmative claim against the School.  Accordingly, Hunt's motion for summary judgment on its indemnification claims is granted with respect to its defense costs and attorneys' fees/disbursements associated with the School's counterclaims.

### F.    Hunt's "Pass Through" Motion for Summary Judgment against Interstate to Dismiss Interstate's Counterclaims

---

[8]    While Hunt does not expressly rely upon section 27.1 in its briefing on its motion for summary judgment on the indemnification claim, it pointed to section 27.1 in its related briefing on Interstate's motion for partial summary judgment discussed *supra*.  See Pl. Opp. to Interstate's Mot. Part. Summ. Jdmt. at 8. Furthermore, in its Fourth Party Complaint, Hunt relies upon its indemnification rights under the Subcontract generally.  See Fourth Party Complaint, ¶ 116.

Hunt argues that it is entitled to summary judgment on Interstate's counterclaims for payment if the Court rules in favor of the School on its counterclaims against Hunt based on Interstate's acts and omissions.  Because the School's counterclaims have been dismissed as waived, this motion is now moot and denied without prejudice.  In that connection, Hunt's request to strike Interstate's supplemental briefings is also rendered moot by this Court's ruling on the School's counterclaims.

## III.   CONCLUSION

For the foregoing reasons, the Court grants the following motions:  Hunt's motion for summary judgment against the School, G.R. Murray's motion for summary judgment against the School, and Hunt's motion for summary judgment on its indemnification claim against Interstate.  The Court denies as moot the School's cross-motion for partial summary judgment, Interstate's motion for partial summary judgment on its breach of contract counterclaim, and Hunt's "Pass Through" motion for summary judgment.  In light of these rulings, all of the parties' various claims have been adjudicated and this case is closed.

/s/ Freda L. Wolfson_____
Hon. Freda L. Wolfson, U.S.D.J.

Dated:          September 16, 2010